IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANETTE K. RAMSEY,
Plaintiff,
v.
LABETTE COUNTY MEDICAL CENTER,
Defendant.

Case No. 06-2222-JPO

**MEMORANDUM AND ORDER**

I. Introduction

The plaintiff, Janette K. Ramsey, alleges the defendant, Labette County Medical Center (sometimes referred to as "LCMC"), terminated her employment on the basis of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. The case is now before the court[1] on defendant's motion for summary judgment **(doc. 34)**. The instant motion has been fully briefed (*see* docs. 35, 36, 42, & 44).

[1]On April 2, 2007, by consent of both parties, this case was reassigned for disposition from Hon. Julie A. Robinson, U.S. District Judge, to the undersigned U.S. Magistrate Judge, James P. O'Hara (*see* doc. 28).

## II. Facts[2]

Plaintiff was born in 1953 and received an associate's degree in radiologic technology in 1974. Defendant is a full-service, county hospital with both inpatient and outpatient services. Defendant hired plaintiff in 1975 as a technologist and promoted her to Assistant Chief of Radiology in 1989. Plaintiff was promoted again to the Acting Director of Radiology in 1997 and was named the Director of Radiology[3] around March of 1998. As Director of Radiology, plaintiff oversaw the department's subdepartments, including X-ray, Mammography, Bone Densitometry, Computerized Tomography ("CT"), Magnetic Resonance Imaging ("MRI"), Nuclear Medicine, and Ultrasound.

Around the time plaintiff became the director, Robert MacDevitt became LCMC's Chief Executive Officer ("CEO"). Mr. MacDevitt never had a problem with plaintiff's performance. In fact, he was very complimentary of her performance. He once remarked plaintiff "was one of the best people the hospital had." Suzanne Cotton, plaintiff's direct supervisor until late 2004, commented plaintiff thought things through and her department was operated very well. Defendant evaluated plaintiff's performance as "exceeding expectations" in 2001, 2002, 2003, and April 2004. Plaintiff received merit-based pay raises in 2001, 2002, and 2003.

---

[2]The court, of course, construes the facts in the light most favorable to plaintiff as the nonmoving party pursuant to Fed. R. Civ. P. 56. Immaterial facts and those not properly supported by the record are omitted. When necessary, additional facts are included in the analysis section of this memorandum and order.

[3]The Radiology Department is also referred to as the Diagnostic Imaging Department.

At a hospital retreat in the fall of 2003, the Board of Trustees and various employees discussed defendant's future. Vincent Schibi, President/Chairperson of the Board, articulated that what defendant really needed was "younger, fresh blood." In November 2003, Mr. Schibi and another board member terminated CEO MacDevitt, who was then fifty-nine years old. At a hospital directors' meeting, Mr. Schibi described characteristics defendant was looking for in its new CEO and stated that defendant was looking for a "young man." Defendant's Finance Committee met in the spring of 2004 to discuss the hospital's financial future and how to cut costs. After Mr. Schibi commented that defendant had a lot of older, long-term employees, another board member asked Ken Jones, defendant's Human Resources ("HR") Director, "you've been here a long time, are you about ready to retire?"[4]

William Mahoney became defendant's new CEO in July 2004, when he was thirty-nine years old. During a meeting with Tom Shaw, the Director of Environmental Services, Mr. Mahoney commented that Mr. Shaw was probably planning to retire.

Around late 2004, Janet Ball was promoted to Vice President of Patient Care/Chief Nursing Officer and became plaintiff's direct supervisor. Ms. Ball reported to Mr. Mahoney. Ms. Ball is approximately six years older than plaintiff.

In July 2004, Mr. Mahoney informed plaintiff he heard from the community that one or two individuals were having a difficult time getting MRI appointments during hours when

[4]Although defendant generally denies these comments, as earlier indicated the court construes the facts in the light most favorable to plaintiff and analyzes the comments as if they were made.

they were not at work. The individuals were traveling to another town to get after-hours MRI appointments. Mr. Mahoney observed there seemed to be a need for more hours in MRI. Plaintiff disagreed that there was a need for extended hours and testified she was never directed to extend MRI's hours.

Defendant claims plaintiff represented the MRI hours were expanded. Plaintiff denies ever misrepresenting that she had extended MRI's hours. Ms. Ball then made a "secret shopper" call to see if she could schedule an appointment during the expanded hours. She asked about making a mammogram appointment, as opposed to an MRI one. Ms. Ball then revealed her identity and asked the scheduler about the extended hours for mammogram, MRI, and CT. She was told the schedulers used to make later appointments but that the technologists told them to stop doing so. Ms. Ball felt plaintiff should have known when her staff members were working and what hours appointments were being scheduled. Mr. Mahoney and Ms. Ball informed plaintiff that someone had tried unsuccessfully to get a later appointment. At a meeting involving Mr. Mahoney, Ms. Ball, and plaintiff, Mr. Mahoney asked why plaintiff had not expanded the hours. Plaintiff expanded the MRI hours in February 2005.

Mr. Mahoney and Ms. Ball had concerns there may have been abuse of overtime and call-back (i.e., performing work from the emergency room after normal hours) in plaintiff's department. It appeared to Ms. Ball these improprieties involved one employee in particular. Ms. Ball threw away some documents related to her investigation into whether or not a

certain employee was abusing the call-back procedure because they did not prove impropriety. Plaintiff admits one employee had the majority of call-back time. When asked about the issue during her employment, plaintiff did not explain that the call time was scheduled by employees, not by plaintiff. Mr. Mahoney and Ms. Ball had a conversation with plaintiff about the seriousness of overtime and call-back abuse and about the appearance of impropriety.

Certain employees in plaintiff's department expressed concern to Ms. Ball that plaintiff favored a certain employee and allowed unprofessional behavior to take place in the department. Some of these employees told Ms. Ball they were afraid to raise the issues with plaintiff, as they thought she would retaliate against them as she had done with another employee. Plaintiff denies she favored a particular employee. Mr. Mahoney told plaintiff he received complaints about her regarding favoritism.

Mr. Mahoney discussed with plaintiff the financial impact of not securing another permanent nuclear medicine technician, and instead using a "traveler." Plaintiff cites revenue and expense figures to show that expenses associated with the traveling technologists were not impacting the subdepartment's bottom line. Plaintiff made several efforts to secure a second nuclear technologist but had difficulty doing so. Plaintiff obtained approval from defendant's administrators, including its CEO, before bringing in a traveling technologist.

Plaintiff agreed with Mr. Mahoney when he told her he felt employees in her department did too much socializing. Plaintiff has described an event one of her employees attended, which she claims prompted the discussion with Mr. Mahoney.[5] Mr. Mahoney once told plaintiff he believed she needed to work more than forty hours per week, although he did not explain how many additional hours she should work or what she should be doing during the additional hours.

In 2004, defendant purchased a new piece of expensive, radiological equipment. Although the machine worked, it only produced hard-copy films and not digital images. Mr. Mahoney believed plaintiff failed to adequately inform the administrative team about the issues with this machine. Plaintiff asserts she adequately informed the administrative team about the issues.

Mr. Mahoney and Ms. Ball were concerned that plaintiff allowed an employee to leave within days of the recruitment fee accrual, thus resulting in a financial loss for the hospital. Plaintiff defends that the individual abruptly resigned from defendant in December 2004. Plaintiff immediately informed defendant's HR Director. The individual's resignation occurred after she had been with defendant for ninety days, which prevented defendant from being reimbursed certain monies. Defendant understood plaintiff received notice the

---

[5]The event also involved several employees in the Emergency Medical Services ("EMS") Department. Plaintiff appears to have described this event in an effort to suggest that defendant did not also terminate the Director of EMS, who was thirty years old at the time. This bar-b-cue and football game involving one of plaintiff's employees, however, is merely an explanation offered by plaintiff of where Mr. Mahoney's perceptions regarding socializing may have originated.

individual would be leaving before the ninety days had actually run. Although it is unclear when the employee gave plaintiff notice of her resignation, plaintiff does not controvert Mr. Mahoney and Ms. Ball's subjective concerns regarding the departure.

Mr. Mahoney perceived or observed plaintiff's unprofessional, ongoing dispute with the Lab Director, Dennis Yoder, plaintiff's public expression of her concerns at a board meeting that he felt should have been addressed in a different setting, and plaintiff's failure to keep confidential certain employee information. Plaintiff only had one issue with Mr. Yoder, that he told his employees plaintiff had been fired when no such thing had happened yet. Plaintiff admits she raised an issue with defendant's building plans at a Board of Trustees' meeting.

Mr. Mahoney felt plaintiff was responsible for ensuring the radiologist, Dr. Gibbs, had the necessary resources to perform his job. Mr. Mahoney understood, through reports from Dr. Gibbs, that plaintiff failed to secure voice mail and an administrative assistant for him, despite his requests. Plaintiff asserts she tried to accommodate the radiologist when possible even though her job description did not require her to do so. She did not have a copy of defendant's contract with Dr. Gibbs and did not know what defendant had promised him. Plaintiff did work with Dr. Gibbs on voice mail issues and was in the process of getting HR to post an administrative assistant position opening. Regardless of whether plaintiff accommodated Dr. Gibbs, plaintiff does not controvert Mr. Mahoney's subjective feelings

about her responsibilities to Dr. Gibbs. At one point, Dr. Gibbs informed plaintiff that someone was "skating on thin ice."

Dr. Gibbs also relayed to plaintiff Mr. Mahoney's displeasure that plaintiff did not hire Jason Davis, an acquaintance of Mr. Mahoney's. Mr. Davis came in unexpectedly to interview for a position. Plaintiff did not hire him because he was not qualified and a position had not been posted.

Ms. Ball had commented to plaintiff that with Mr. Mahoney you're "either on the boat with him or you're not." Plaintiff assumed Ms. Ball was talking about her. Ms. Ball also told plaintiff that Mr. Mahoney perceived her to be "hesitant and resistant." Ms. Ball informed plaintiff that Mr. Mahoney felt the "Indians were running the Chief" in her department.

Mr. Mahoney told plaintiff he felt she was hesitant concerning his direction. Plaintiff told Mr. Mahoney she could understand why he might think she was hesitant to follow his directives but she did not think she was being hesitant. Plaintiff admitted she was "hesitant in her reaction" and "standoffish" to Mr. Mahoney on a personal level. Many of these statements were recorded during a meeting between plaintiff and Mr. Mahoney, during which plaintiff wore a small tape recorder in her brassiere. Plaintiff recorded the meeting because she was concerned about how another director's meeting with Mr. Mahoney had transpired.

A few days after her meeting with Mr. Mahoney, plaintiff held a meeting with the employees she supervised in her department. Robert Ponce, an employee who worked under

plaintiff, discussed this meeting with Mr. Mahoney. Mr. Ponce then wrote Mr. Mahoney a letter informing him that plaintiff had counseled her staff about ways to circumvent Mr. Mahoney's directives related to call-back and overtime.[6] Plaintiff denies she counseled her staff about ways to circumvent Mr. Mahoney's directives. Upon receiving the letter, Mr. Mahoney did not investigate the matter by contacting plaintiff or any other employees at the meeting. The information Mr. Mahoney received from Mr. Ponce was "the straw that broke the camel's back" in terms of deciding to terminate plaintiff.

The administrative team had discussed concerns about plaintiff for months. Mr. Mahoney and Ms. Ball terminated plaintiff's employment, effective July 8, 2005. Mr. Mahoney and defendant's HR Director went into plaintiff's office that morning. Mr. Mahoney told plaintiff that defendant was "restructuring the department and there was no place in that restructuring for [plaintiff]." The HR Director tendered plaintiff a severance agreement and then walked plaintiff to her car.

At the time of her termination, plaintiff was fifty-two years old. Following plaintiff's termination, Linda Davis, who was born in 1950, served as the interim director. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 21, 2005. In response to the EEOC's investigation of the case, defendant

[6]Although plaintiff concedes Mr. Ponce and Mr. Mahoney each claim Mr. Ponce drafted the letter and provided it to Mr. Mahoney, she claims whether Mr. Ponce actually drafted it is open to debate. This assertion is not supported by a citation to the record. The court therefore relies on Mr. Ponce's testimony that he did draft the letter.

stated in a letter on September 28, 2005 that Deborah Smart would start in November. Ms. Smart, plaintiff's permanent replacement, was born in 1955.

In addition to former CEO Robert MacDevitt and plaintiff, defendant terminated or demoted several other older, high-level employees. In February 2004, defendant's interim CEO informed Barbara Clark, the Marketing Director, that defendant was closing the Marketing Department due to financial constraints. Defendant then terminated Ms. Clark, who was in her sixties at the time. Defendant had a policy that provided employees with recall rights for twelve months following any reductions in force. Mr. Mahoney was aware of this policy and contracted with an individual for marketing services. One year and one day after Ms. Clark's termination, defendant reopened its Marketing Department with a thirty-eight year-old director.

Sherry Payne served defendant as the Director of Surgery for more than ten years. In August 2004, defendant demoted her to Surgical Resource Coordinator in the Material Management Department. After Mr. Mahoney informed Ms. Payne he was going to reduce her pay, he agreed to keep her at her old salary. When Ms. Payne was told that returning to her former position was not an option, she resigned. At the time of Ms. Payne's demotion, she was fifty-one years old.

On September 27, 2004, defendant terminated Suzanne Cotton, Vice President of Patient Care and Chief Nursing Officer. She was told defendant was going in a new direction and she was not part of the plan. At the time of her termination, Ms. Cotton was

fifty-two years old. While employed by defendant, Ms. Cotton received above average evaluations and merit-based raises. Derek Vance, a thirty year-old, assumed part of Ms. Cotton's former duties. Ms. Ball, who is older than Ms. Cotton, assumed the rest of Ms. Cotton's duties.

Defendant also terminated Ken Jones, the Human Resources Director, on September 27, 2004. Mr. Jones was also advised that defendant wanted to go in a different direction. He was fifty-seven years old when he was terminated. Mr. Jones had received above average evaluations and merit-based pay raises through his tenure with defendant. Plaintiff was on the committee that interviewed candidates and recommended Christina Sykes, who was born in 1970, to replace Mr. Jones. Mr. Mahoney was not on the committee but did sit in on the discussions. Mr. Mahoney made the ultimate decision to hire Ms. Sykes.

On November 2, 2004, defendant terminated Susan Souders, the Emergency Room Director. Ms. Souders was fifty years old at the time of her termination. Ms. Souders developed into one of defendant's best department directors. Defendant did not replace Ms. Souders but assigned her duties to Linda West, who was born in 1957. Ms. Souders was offered another, lower-paying, position, which she declined.

Defendant also terminated Candi Rexwinkle on November 2, 2004. Ms. Rexwinkle was the Nursing Director of the Post-Operative Surgical and Rehabilitation Units, and she was in her fifties at the time of her termination. Defendant assigned Ms. Rexwinkle's duties to Kathy McKinney, who was born in 1959, and Donna Wood, who was born in 1952. Ms.

Rexwinkle was offered a position with defendant when she was terminated. She applied for a position, which defendant filled with a thirty-six year-old.

One day later, on November 3, 2004, defendant terminated Tom Shaw, the Director of Environmental Services, who was fifty-two years old. Mr. Mahoney told Mr. Shaw no one was needed in his position and two younger current employees would assume his duties. At some point later, Mr. Mahoney reversed his decision and reinstated Mr. Shaw to perform his previous duties at a reduced salary.

On July 8, 2005, defendant terminated the employment of Debora Heberlein, the Director of Health Information Systems. Ms. Heberlein, who had always received satisfactory evaluations, was informed that defendant was changing direction. Ms. Heberlein was forty-seven years old at the time of her termination. After using an independent contractor to perform information technology services, defendant eventually replaced Ms. Heberlein with Kevin Shaw, who was born in 1963. Mr. Mahoney was not on the committee who interviewed candidates for the position. Defendant did not replace Ms. Heberlein until after she had filed an EEOC charge of discrimination.

Debora Shaw was a manager of one of defendant's clinics. In September 2005, defendant informed her that her position was being eliminated in favor of having one manager over all of the clinics. Ms. Shaw applied for the new managerial position but was rejected in favor of a man in his thirties. Ms. Shaw, who was in her fifties, was then demoted to x-ray technician. Mr. Mahoney was not the decision maker related to this position change.

When Mr. Mahoney was hired in July 2004, eighty percent of the twenty-five directors were over the age of forty. The average age of the directors was forty-seven years. As of July 2005, the month of plaintiff's termination, seventy-five percent of the twenty-four directors were over the age of forty. The average age of the directors was forty-five years.

III. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and it is "entitled to a judgment as a matter of law."[7] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[8] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[9] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[10]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[11] In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not

---

[7] Fed. R. Civ. P. 56(c).

[8] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[10] *Id.* (citing *Anderson*, 477 U.S. at 248).

[11] *Id.* at 670-71.

negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[12]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[13] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[14] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[16]

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[17]

IV. Analysis

Plaintiff claims defendant terminated her employment on the basis of her age, in

---

[12] *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[13] *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment).

[14] *Anderson*, 477 U.S. at 256.

[15] *Adler*, 144 F.3d at 671.

[16] *Id.*

[17] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

violation of the ADEA.[18] As plaintiff acknowledges the absence of direct evidence of age discrimination, her claim must be analyzed under the *McDonnell Douglas*[19] burden-shifting approach.[20] Under this approach,

> the plaintiff must first establish a prima facie case of discrimination. The burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Once this is done, the presumption of discrimination established by the prima facie showing "simply drops out of the picture." The plaintiff then carries the full burden of persuasion to show that the defendant discriminated on the illegal basis of age or gender. The plaintiff may do so by showing that the proffered reason is pretextual.[21]

A. Prima Facie Case

To establish a prima facie case, a discharged plaintiff must show she was: "(1) within the age group protected by the ADEA when [she] was terminated, (2) performing [her] job satisfactorily, (3) discharged, and (4) replaced by a younger person."[22] The ADEA protects

[18] The ADEA provides, in relevant part: "[i]t shall be unlawful for an employer to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

[19] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[20] *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005).

[21] *Id.* at 1124-25 (citations omitted).

[22] *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).

individuals who are at least forty years old.[23] Here, it is undisputed that defendant terminated plaintiff when she was fifty-two years old and that she is within the ADEA's protected age group. But defendant argues plaintiff cannot establish triable issues as to the second and fourth elements of her prima facie case.

1. Satisfactory Job Performance

A plaintiff must make a showing of satisfactory work performance to prove a prima facie case of an ADEA discharge claim.[24] Defendant suggests plaintiff cannot prove this element because of several performance issues, including being resistant to Mr. Mahoney's directives. Defendant cites a number of these same reasons for plaintiff's discharge, focusing on plaintiff's alleged failure to follow directives.

Defendant is essentially urging the court to require plaintiff to disprove its proffered nondiscriminatory reasons for discharging her at the prima facie stage.[25] "[S]uch a legal analysis would inappropriately short-circuit the *McDonnell Douglas* framework at the prima facie stage and frustrate plaintiff's ability to establish that defendant's proffered reasons are pretextual."[26] Thus, the court will not consider defendant's proffered reasons for discharge

---

[23]29 U.S.C. § 631(a); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

[24]*MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991).

[25]*See Bennett v. Emerson Elec. Co.*, 160 F. Supp. 2d 1244, 1249 (D. Kan. 2001).

[26]*Id.*; *see also MacDonald*, 941 F.2d at 1119 (discussing the potential effects of this short-circuiting).

in assessing the existence of a prima facie case.[27]

A plaintiff may prove the second element of her prima facie case of discrimination in a discharge case by "credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time."[28] Here, plaintiff had the same objective qualifications she did when she was hired as director: her associate's degree in radiologic technology and her experience as a radiology technologist and as Assistant Chief of Radiology. Further, plaintiff had been in her position for more than seven years, a significant period of time, before she was terminated.[29] Therefore, the court finds that plaintiff has satisfied the second element of her prima facie case with this evidence.

2. Replacement Employee

Generally, "the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."[30] In an age discrimination case, "such an inference cannot be drawn from the replacement of one worker

---

[27]*See Bolton v. Sprint/United Mgmt. Co.*, 220 F. App'x 761, 766 (10th Cir. 2007); *MacDonald*, 941 F.2d at 1119; *Bennett*, 160 F. Supp. 2d at 1249.

[28]*MacDonald*, 941 F.2d at 1121 (internal citations omitted).

[29]*See id.* (holding four years was a significant period of time).

[30]*O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (internal quotation omitted).

with another worker insignificantly younger."[31] Two years between the replacement worker's age and the plaintiff's age is not a significant difference in age and does not create the necessary inference of discrimination.[32] Here, Ms. Davis performed plaintiff's duties after she was terminated. Ms. Davis is three years older than plaintiff, and therefore, their difference in age does not create an inference of discrimination. But the court will not end its inquiry here, i.e., the court will follow other courts that have looked to the permanent replacement as "the more reliable barometer of the presence or absence of invidious intent."[33] Plaintiff's permanent replacement, Ms. Smart, is two years younger than plaintiff. The age difference between plaintiff and Ms. Smart is also insignificant.

Plaintiff argues little can be inferred from the age of her permanent replacement due to the timing of her replacement's hiring. Although it is unclear when defendant hired Ms. Smart, defendant does not dispute the decision to hire her was made after defendant had notice plaintiff had filed an EEOC charge of age discrimination. Plaintiff suggests that by hiring a replacement after having notice of plaintiff's pending EEOC charge, defendant had incentive to hire a replacement older, or at least insignificantly younger, than plaintiff and in turn thwart plaintiff's likelihood of proving a prima facie case.

Other courts have addressed arguments similar to plaintiff's in race discrimination

---

[31]*Id.* at 313.

[32]*Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000).

[33]*Sheets v. Nat'l Computer Sys., Inc.*, No. Civ. 3-99-CV-30091, 2000 WL 33364120, at *6 (S.D. Iowa Dec. 7, 2000).

cases. When a minority plaintiff is replaced by another minority, the fourth element of a plaintiff's prima facie case may be in jeopardy. Courts consider, however, the length of time between the plaintiff's discharge and the hiring of the replacement, and whether the hiring of the replacement occurred after the filing of plaintiff's EEOC charge.[34] Plaintiffs who did not show their employers had notice of their EEOC charges at the time of their replacement's hire were unable to meet their prima facie burden.[35] Courts have held that hiring a replacement after plaintiff filed her EEOC charge coupled with the position being open for just over a month and a half[36] or eleven months[37] is sufficient to satisfy plaintiff's prima facie case or at least calls for a more relaxed standard for the fourth element.

Under the ADEA and other antidiscrimination statutes, "the fourth element of a prima

---

[34] *See, e.g.*, *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1534-35 (11th Cir. 1984); *Etienne v. Muvico Theaters, Inc.*, No. 01-6265-Civ., 2003 WL 21184268, at *9 (S.D. Fla. 2003); *Sheets*, 2000 WL 33364120, at *7; *Paldano v. Althin Med., Inc.*, 974 F. Supp. 1441, 1446 (S.D. Fla. 1996)

[35] *See Carr v. WestLB Admin., Inc.*, 171 F. Supp. 2d 302, 307-08 (S.D.N.Y. 2001) (emphasizing that plaintiff's allegation his replacement was hired "around the same time" as he filed his EEOC charge without further evidence was conclusory and insufficient); *Sheets*, 2000 WL 33364120, at *8 (concluding that lack of evidence decision maker knew of EEOC charge when hiring replacement coupled with a period of only seven weeks between plaintiff's discharge and the replacement hiring was insufficient to satisfy the fourth element).

[36] *Etienne*, 2003 WL 21184268, at *9. *Cf. King v. Kirkland's Stores Inc.*, No. 2:04-cv-1055-MEF, 2006 WL 2239208, at *11 n.19 (M.D. Ala. Aug. 4, 2006) (holding that the position being open for a month and a half and being filled after plaintiff filed her EEOC charge was insufficient evidence "from which a reasonable jury could find that the [replacement] was designed to disguise an act of discrimination").

[37] *Howard*, 726 F.2d at 1535.

facie case 'is a flexible one that can be satisfied differently in varying scenarios.'"[38] Although plaintiff's replacement was not significantly younger than she, the facts surrounding the replacement's hiring prevent any inference from being made based solely on the replacement's age. Plaintiff's replacement was not hired for more than two and a half months after her termination and not until after she had filed her EEOC charge. Such facts call for the court to apply a more flexible standard for the fourth element. By hiring a replacement insignificantly younger than plaintiff when it did, defendant's mindset and intentions are at least called into question. Therefore, the court finds that plaintiff has satisfied her burden for the fourth element of a prima facie case. Now that plaintiff has established her prima facie case, the burden of production shifts to defendant to articulate a nondiscriminatory reason for her discharge.

B. Pretext

Plaintiff concedes that defendant has articulated a nondiscriminatory reason for her discharge, i.e., problematic job performance. Specifically, defendant claims it terminated plaintiff's employment after months of dealing with what the administration perceived to be plaintiff's failure to follow directives. Thus, the burden shifts back to plaintiff to show the proffered reason is a pretext for discrimination.[39]

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies,

---

[38]*Bolton*, 220 F. App'x at 766 (*quoting Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)).

[39]*See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006).

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[40] Significantly, in determining whether defendant's reason for terminating plaintiff is pretextual, the court examines the facts as they appeared to Mr. Mahoney and Ms. Ball, the people who made the decision to terminate plaintiff's employment.[41] The court does not inquire as to whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed the reasons and acted upon them in good faith.[42]

1. Shifting Reasons for Termination Decision

Plaintiff argues defendant has shifted its reasons for her termination over time and that this supports a finding of pretext. For the reasons explained below, the court respectfully disagrees.

"[A] jury can infer pretext when an employer, at the time of trial, offers a new reason for an adverse employment action that is unsupported by documentary evidence."[43] Changing reasons for a termination may indicate pretext. It is important to bear in mind, however, that an employer can elaborate on its initial reasons given to plaintiff for her

---

[40]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted).

[41]*See Power v. Koss Constr. Co.*, 499 F. Supp. 2d 1194, 1204 (D. Kan. 2007).

[42]*Id.*

[43]*Matthews v. Euronet Worldwide, Inc.*, 505 F. Supp. 2d 850, 857 (D. Kan. 2007) (citing *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813 n.6 (10th Cir. 2000)).

termination, including identifying examples or deficiencies that are part and parcel of the reason for the termination.[44]

When plaintiff was being terminated, Mr. Mahoney told her they were restructuring her department and there was no place in that restructuring for her. Plaintiff was then presented with a proposed severance agreement which offered to characterize her separation as without cause, at least as is relevant for references. It appears the severance agreement was not signed by either party. Plaintiff attempts to use language in this unsigned offer as one of defendant's reasons for her termination, which she claims has changed over time. Even if the proposed agreement were admissible,[45] the court is unpersuaded the language relating to references is indicative of defendant's reasons for terminating plaintiff.

Over the course of this litigation, defendant has given several examples of its perceptions that plaintiff was failing to follow directives. Mr. Mahoney perceived the following issues with plaintiff's performance: (1) an inadequate effort to fill the open nuclear medicine position; (2) inadequate oversight to ensure the hours of operation were extended to those which Mr. Mahoney directed; (3) employee complaints about favoritism by plaintiff toward one employee; (4) insufficient information from plaintiff about the functioning of the new x-ray machine; (5) plaintiff allowing an employee to leave soon after the recruitment fee

---

[44]*See id.* at 858-59.

[45]*See Haynes v. Gernsbacher's, Inc.*, No. 4:01-CV-594-A, 2002 WL 1783905, at *4 (N.D. Tex. July 31, 2002) (holding a severance offer does not constitute admissible evidence).

accrued; (6) plaintiff's ongoing dispute with the Lab Director; (7) plaintiff expressing concerns at a board meeting instead of in a different setting; (8) plaintiff's failure to provide Dr. Gibbs with necessary resources; (9) plaintiff's failure to keep certain employee information confidential; (10) an abuse of overtime and call-back in plaintiff's department; (11) plaintiff's continued resistance to the administration's directives; and (12) plaintiff's uncooperative attitude.

The court finds that, as a matter of law, plaintiff's department being restructured does not conflict with her being terminated because of performance issues and giving the perception of failing to follow directives. That is, defendant never has claimed plaintiff's department was being restructured such that plaintiff's position was being eliminated.

2. Failure to Follow Company Policy

Plaintiff alleges defendant failed to follow its policy governing written complaints. This may show pretext where defendant actually acted contrary to its own policy.[46] Specifically, plaintiff alleges defendant did not follow its "Employee Fair Treatment Policy and Procedure." The procedure is the exclusive remedy for employees with appropriate concerns, which are defined as employees' "expressed feeling[s] of dissatisfaction concerning any interpretation or application of a work related policy by management, supervisors, or other employees." Employees who have an appropriate concern should follow three steps to get resolution, although conflict can by resolved at any step in the

[46] *See Matthews*, 505 F. Supp. 2d at 861-62 (not finding pretext because defendants did not act contrary to the company policy).

process. The third step states "[i]f you are not satisfied with your Department Director's decision and wish to pursue the problem further, you may prepare a written summary of your concerns and request that the matter be reviewed by the LCMC Chief Executive Officer (CEO)." The CEO is then to examine all the facts, advise the employee of his decision within seven working days, and issue a written, final, and binding decision.

Mr. Ponce wrote a letter to Mr. Mahoney to follow up and expand on their recent conversation about a department meeting plaintiff conducted. Mr. Ponce's concern of plaintiff's interpretation and instruction on call-back policies and procedures constitutes an appropriate concern under the policy. Mr. Ponce wrote that the spirit in which the letter was offered was to provide Mr. Mahoney with information of which he might not have been aware. Mr. Ponce did not request the matter be reviewed by Mr. Mahoney; he stated that he was merely providing information to Mr. Mahoney. Defendant did not act contrary to its policy by not fully examining the facts of the concern and issuing a written decision. Mr. Ponce's letter did not comply with the third step of the policy, which would have required such an investigation and written decision. Further, the policy seems to be written to protect the employee who is voicing an appropriate concern, not the employee who is the subject of the concern. The court finds defendant did not act contrary to its policy.

3. Age-related Comments

Plaintiff argues several age-related comments directed at other employees help support a showing of pretext. "'Age-related comments referring directly to the worker may

support an inference of age discrimination.'"[47] A plaintiff can indirectly establish pretext through such allegedly discriminatory statements by showing a nexus between the statements and the employment decision.[48] Isolated comments unrelated to the employee's termination do not show discriminatory animus by themselves.[49] The necessary causal nexus can be shown if the age-related comments were directed at the plaintiff.[50]

Plaintiff points to four specific age-related comments: (1) Mr. Schibi's comment in the fall of 2003 that defendant really needed "younger, fresh blood"; (2) Mr. Schibi's statement that defendant was looking for a "young man" for its new CEO; (3) a board member asking Mr. Jones if he was about ready to retire; and (4) Mr. Mahoney's comment to Mr. Shaw that the latter was probably planning to retire. None of these comments are related to defendant's decision to terminate plaintiff's employment. They focus on defendant's CEO search and the retirement plans of Messrs. Jones and Shaw. Further, none of the comments were directed at plaintiff. Plaintiff has not established the necessary nexus between the comments and her termination. These comments are therefore stray remarks, which do not create a triable issue.[51]

---

[47]*Power v. Koss Constr. Co.*, 499 F. Supp. 2d 1194, 1204 (D. Kan. 2007) (*quoting Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994)).

[48]*Id.* at 1204-05.

[49]*Barnes v. Foot Locker Retail, Inc.*, 476 F. Supp. 2d 1210, 1215 (D. Kan. 2007).

[50]*Id.*

[51]*See Cone*, 14 F.3d at 531.

4. Pattern and Practice of Terminating Older, High-Level Employees

Plaintiff alleges defendant had a pattern and practice of terminating and demoting its older, high-level employees beginning in the fall of 2003. But individual plaintiffs cannot use the *International Brotherhood of Teamsters v. United States*[52] pattern-or-practice method of proving discrimination.[53] "[A]n individual plaintiff may use evidence of a pattern or practice of discrimination to help prove claims of individual discrimination within the *McDonnell Douglas* framework."[54] However, pattern and practice evidence standing alone is rarely sufficient to show pretext.[55]

Evidence used to show a pattern and practice of an employer treating employees in a protected class differently than other employees must show a significant disparity in the employer's treatment and must eliminate nondiscriminatory reasons for the treatment.[56] Statistics must include a comparison of how the employer treated similarly situated employees.[57] The length of time between plaintiff's termination and the terminations of others in the protected class is relevant to determining if a pattern or practice of

---

[52] 431 U.S. 324 (1977).

[53] *DeWalt v. Meredith Corp.*, 484 F. Supp. 2d 1188, 1197 (D. Kan. 2007).

[54] *Id.*

[55] *Ortiz v. Norton*, 254 F.3d 889, 897 (10th Cir. 2001).

[56] *Schartz v. Unified Sch. Dist. No. 512*, No. 95-2491, 1997 WL 614339, at *4 (D. Kan. Sept. 30, 1997).

[57] *Id.*

discrimination existed.[58]

Here, plaintiff points to the terminations or demotions of eleven high-level employees in support of her pattern and practice argument. All of the employees were at least forty-seven years old when they were terminated or demoted. Nine of these terminations or demotions happened after Mr. Mahoney became CEO and within almost a year of each other.[59]

Plaintiff has not provided statistics comparing how defendant treated similarly situated employees. The only statistics provided show the percentage of directors over the age of forty and the average age of the directors at two points in time. These figures do not show a significant disparity between how defendant treated employees over the age of forty with how it treated younger employees. As earlier indicated, the average age of directors decreasing by only two years over the course of a year and the fact that eighty percent of the directors were over forty in one year, versus seventy-five percent in the next year, does not show a pattern or practice of discrimination. Although plaintiff presented evidence many of the employees were performing satisfactorily or were told defendant was merely restructuring, plaintiff has not eliminated nondiscriminatory reasons for the treatment.

Plaintiff has included evidence of the ages of the replacements for the terminated or

---

[58]*See id.* at *5.

[59]These nine employees are plaintiff, Sherry Payne, Suzanne Cotton, Ken Jones, Susan Souders, Candi Rexwinkle, Tom Shaw, Debora Heberlein, and Debora Shaw. Robert MacDevitt and Barbara Clark were terminated before Mr. Mahoney became CEO.

demoted employees. Several of the replacements are younger than the employees they replaced. The court, however, does not believe this evidence is sufficient to show a pattern or practice of discriminatory behavior.

5. Weak, Implausible, Inconsistent, and Contradictory Reasons for Termination Decision

Plaintiff argues defendant's nondiscriminatory reasons for her termination are weak, implausible, inconsistent, and contradictory, and therefore, are pretextual. As stated earlier, the court examines the facts as they appeared to Mr. Mahoney and Ms. Ball. Thus, it is their perception of plaintiff's performance that is relevant, not her subjective evaluation of her own performance.[60] Plaintiff has alleged several facts in defendant's "Statement of Uncontroverted Facts" are inadmissible hearsay. These statements, however, are not offered to prove the truth of the matter asserted, but to prove what the decision makers were told and thus believed or to prove defendant's motive in terminating plaintiff.[61] Although unable to disprove Mr. Mahoney or Ms. Ball's perceptions and beliefs regarding plaintiff's performance, plaintiff often controverted the underlying facts. Because it is the decision makers' perceptions that are relevant, plaintiff has not created issues of material facts.

Plaintiff claims that defendant terminating her because her employees were abusing call time and overtime is inconsistent with defendant's own investigation. Despite Ms. Ball

---

[60] *See Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996).

[61] *See* Fed. R. Evid. 801; *Powers v. Tweco Prods., Inc.*, 206 F. Supp. 2d 1097, 1106 (D. Kan. 2002); *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 553 n.2 (D. Kan. 1995).

throwing away documents that did not prove impropriety, Mr. Mahoney and Ms. Ball still had concerns there may have been abuse in plaintiff's department and about the appearance of impropriety in the department. Their concerns about the appearance of impropriety are not inconsistent with their investigation.

Plaintiff asserts defendant terminated her for failing to live up to defendant's contract with the radiologist, Dr. Gibbs. Plaintiff claims this was contrived after the fact because she has never seen the contract. One of the examples of plaintiff's performance issues cited by defendant is her failure to provide Dr. Gibbs with the resources he needed. Mr. Mahoney felt plaintiff was responsible for ensuring Dr. Gibbs had the necessary resources but had received reports that plaintiff failed to fulfill his requests. Although plaintiff worked to accommodate Dr. Gibbs, she cannot controvert Mr. Mahoney's belief that she did not adequately respond to Dr. Gibbs.

According to plaintiff, defendant alleges she should have been clairvoyant and preemptively terminated the nuclear medicine technologist prior to the end of the ninety-day period. It is unclear when plaintiff received notice of the technologist's resignation. Regardless, plaintiff is unable to controvert Mr. Mahoney and Ms. Ball's concerns about the departure, based on their understanding that plaintiff received notice during those ninety days.

Plaintiff objects to defendant terminating her for favoring a particular employee by awarding her a majority of the call time because the employees made the call schedule.

Defendant, however, did not claim plaintiff favored an employee by awarding call time. Mr. Mahoney and Ms. Ball had received complaints about plaintiff favoring a particular employee. Mr. Mahoney and Ms. Ball's actions were properly taken on the basis of the complaints, similar to them acting based on their perceptions. That any underlying favoritism did or did not occur is immaterial.

One example of plaintiff's performance issues cited by defendant is an inadequate effort by plaintiff to fill the nuclear medicine position. Plaintiff asserts Mr. Mahoney approved of the decision to use a traveling technologist and the expense was minimal compared to the nuclear medicine revenues. Plaintiff misses the point. Courts do not second guess employers' business decisions, absent some evidence of impermissible motives.[62] It is irrelevant how much a traveling technologist cost defendant. The approval of using a traveling technologist is not inconsistent with Mr. Mahoney perceiving that plaintiff put forth an inadequate effort to fill the position.

Plaintiff did expand the MRI hours several months before her termination. Whether plaintiff misrepresented she had expanded the hours when she had not done so, and whether she was explicitly directed to expand the hours, are immaterial. Ms. Ball felt plaintiff should have known when her staff members were working and when appointments were being scheduled. Mr. Mahoney's belief that plaintiff inadequately oversaw the hours of operation after his conversations with her about the hours is not inconsistent with the fact that plaintiff

[62]*Furr*, 82 F.3d at 986.

did eventually expand the hours.

These issues are only some of the examples defendant cites of its perception that plaintiff was unwilling to follow directives. Mr. Mahoney and Ms. Ball both expressed to plaintiff that she was perceived as being hesitant. Plaintiff herself conceded she could see why Mr. Mahoney might think she was hesitant to follow his directives and admitted she was hesitant to him, at least on a personal level.

To survive summary judgment, plaintiff must present "sufficient evidence such that there is a genuine issue of material fact concerning whether plaintiff's [age] actually motivated defendant['s] decision to terminate plaintiff's employment."[63] When assessing whether plaintiff has made a showing of pretext, the court considers the evidence as a whole.[64] Here, plaintiff has failed to present sufficient evidence to establish pretext by showing defendant shifted its reasons for terminating her, failed to follow its company policy, made age-related comments, and had a pattern and practice of terminating older employees. Viewing the evidence as a whole, plaintiff has also failed to show defendant's reasons for her termination were weak, implausible, inconsistent, or contradictory.

"While the fact that decision makers are in the same class as a plaintiff is not dispositive, '[a] plaintiff may have difficulty establishing discrimination where the alleged

---

[63]*Matthews*, 505 F. Supp. 2d at 866.

[64]*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004).

discriminatory decision-maker is in the same protected class.'"[65] Ms. Ball, a decision maker involved in terminating plaintiff, is six years older than plaintiff and is also in the age group protected by the ADEA. Although Mr. Mahoney, the other decision maker, is several years younger than plaintiff, Ms. Ball's age clearly makes it more difficult for plaintiff to establish discrimination. Regardless, plaintiff has not presented sufficient evidence to create a genuine issue of material fact of whether her age actually motivated defendant's decision to terminate her employment.

## V. Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1. Defendant's motion for summary judgment **(doc. 34)** is granted.

2. This case is dismissed, with prejudice, with costs assessed against plaintiff.

Dated this 20th day of November, 2007, at Kansas City, Kansas.

s/James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge

---

[65]*Kitchen v. Burlington N. & Santa Fe Ry. Co.*, 298 F. Supp. 2d 1193, 1203 (D. Kan. 2004) (*quoting Kendrick v. Penske Transp. Servs., Inc.*, No. 98-2289, 1999 WL 450886, at *7 (D. Kan. Apr. 13, 1999)) (alteration in original).